## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **GLENDAL FRENCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 23-cv-3045** |
| | ) | |
| **ROB JEFFREYS, CAMILE** | ) | |
| **LINDSAY, and JOHN EILERS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

This matter is before the Court on Defendants Rob Jeffreys',
Camile Lindsay's, and John Eilers' ("Defendants") Motion to Dismiss
(d/e 33) Plaintiff Glendal French's ("Plaintiff") Fourth Amended
Complaint (d/e 32). Because Plaintiff states a claim upon which
relief can be granted, Defendants' Motion (d/e 33) is DENIED.

### I.    BACKGROUND

On May 13, 2025, Plaintiff filed a three-Count Fourth
Amended Complaint (d/e 32) against Defendant Jeffreys, in his
personal capacity and as Illinois Department of Corrections
("IDOC") Acting Director, Defendant Lindsay, in her personal
capacity and as IDOC Chief of Staff, and Defendant Eilers, in his

personal capacity and as IDOC Operations Director. Id. at ¶¶ 3-5.

On May 27, 2025, Defendants moved to dismiss all Counts for failure to plausibly state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (d/e 33). On June 10, 2025, Plaintiff filed a Memorandum in Opposition to Defendants' Motion Seeking Dismissal of His Fourth Amended Complaint (d/e 34).

## II.   FACTS

The following facts are taken from Plaintiff's Fourth Amended Complaint (d/e 32) and are accepted as true at the motion to dismiss stage. Bible v. United Student Aid Funds, Inc., 799 F.3d 633, 639 (7th Cir. 2015).

In 1995, Plaintiff joined IDOC as a correctional officer and progressively rose through the ranks. See d/e 32, ¶ 6. In 2018, Plaintiff was a shift supervisor at the Pontiac Correctional Center ("Pontiac"). Id. at ¶ 7. Plaintiff was a member of the VR704 bargaining unit, represented for collective bargaining purposes by a labor organization affiliated with the Laborers' Union of North America. Id. When Plaintiff held the position of shift supervisor, a

collective bargaining agreement covered the terms of his employment and held that discipline could be imposed on a covered employee only for just cause. Id. at ¶ 8.

As a shift supervisor, Plaintiff was a merit compensation employee protected by the Personnel Code, 20 ILCS 415/1 et seq. Id. at ¶ 21. Because Plaintiff was a merit compensation employee in the VR704 bargaining unit, the collective bargaining agreement between the State of Illinois and the Laborers' Union of North America governed Plaintiff's employment. Id.

Between March 2018 and August 2019, while a shift supervisor, Plaintiff was temporarily assigned the duties of the assistant warden of operations at Pontiac. Id. at ¶ 9. The collective bargaining agreement still covered him during that time. Id.

While Plaintiff temporarily served as the assistant warden at Pontiac, Defendant Eilers on several occasions offered Plaintiff the permanent position of assistant warden of operations at Pontiac. Id. at ¶ 10. As IDOC Operations Director, Defendant Eilers had the authority to discipline and initiate termination actions for employees under his chain of command. Id. at ¶ 5. Plaintiff declined

the offer each time and expressed to Defendant Eilers that, if he accepted the offered position, the collective bargaining agreement would not cover his employment, and he would lose the accompanying job protection. Id. at ¶ 10.

On October 26, 2018, a Pontiac correctional lieutenant required a relatively new Pontiac correctional officer to draw on a fictitious form a picture of an inmate engaging in a sexual act. Id. at ¶ 11. The drawing was disseminated to various Pontiac staff members as a prank and the correctional officer subsequently experienced numerous incidents of harassment including anti-gay slurs. Id. (the events of id. at ¶ 11 "the October 26, 2018, incident"). Three shift supervisors participated in receiving and distributing the form. Id. at ¶ 12.

A few minutes before 3:00 p.m. on October 26, 2018, Plaintiff received a copy of the fictitious form. Id. at ¶ 13. Plaintiff promptly transmitted it to Lieutenant Lance Whitecotton, Pontiac's acting internal affairs officer, without a cover email because Lieutenant Whitecotton's shift ended at 3:00 p.m. Id. at ¶ 14. Plaintiff believed the fictitious form was inappropriate, assumed Lieutenant

Whitecotton would take steps to investigate the preparation and distribution of the drawing upon receiving the form, and wanted Lieutenant Whitecotton to be aware of the drawing before he left Pontiac for the day. Id.

Within minutes of when Plaintiff sent the form, Lieutenant Whitecotton came to Plaintiff's office and Plaintiff explained to Lieutenant Whitecotton that he sent the form to Lieutenant Whitecotton because he felt it was inappropriate and assumed Lieutenant Whitecotton would look into it. Id. at ¶ 15. Lieutenant Whitecotton responded that only the Pontiac Warden could direct an investigation into a staff member. Id.

Shortly before 4:00 p.m. on October 26, 2018, Plaintiff went to his supervisor, Warden Teri Kennedy's office to report that he had received the form. Id. at ¶ 16. Warden Kennedy indicated that she was aware the form had been prepared and disseminated. Id. Plaintiff assumed that Warden Kennedy would take steps to direct an investigation into the October 26, 2018, incident. Id.

Plaintiff had no further involvement with the drawing and had no contact with the correctional officer who prepared it. Id. at ¶ 18.

As the assistant warden of operations at Pontiac, Plaintiff was not involved in or informed of the status of investigations into staff members, such that he did not know whether an investigation into the October 26, 2018, incident occurred or had concluded. Id. at ¶ 17. None of the three shift supervisors referenced earlier, notwithstanding their supervisory responsibilities, took any steps to report or act to stop the prank relating to the drawing and its distribution. Id. at ¶ 19.

In June 2019, the Office of Executive Inspector General began an investigation into the October 26, 2018, incident. Id. at ¶ 24. Upon completing the investigation, the Office of Executive Inspector General issued a report on it. Id. at ¶ 25. Plaintiff alleges that the report concluded that various individuals at Pontiac—including the three shift supervisors referenced previously—"a) became aware of the prank and the fictitious form; b) engaged in disseminating the form in a way that exacerbated the prank; and c) failed to take appropriate, timely and necessary action to address it" such that "each engaged in conduct unbecoming of [an IDOC] supervisor." Id.

Plaintiff alleges that the report found that his involvement in

the October 26, 2018, incident "was limited to sending a copy of the drawing by email to Lieutenant Whitecotton at 2:59 p.m. that afternoon with no text message in the body of the email." Id. at ¶ 26. Plaintiff also alleges that, had IDOC "looked into" the October 26, 2018, incident, IDOC "would have been aware that [Plaintiff's] involvement [in the incident] was limited to" his interactions with Lieutenant Whitecotton and Warden Kennedy as described earlier. Id. at ¶ 23.

After the Office of Executive Inspector General completed its investigation into the October 26, 2018, incident, the three shift supervisors referred to above were initially terminated because of their involvement in the incident. Id. at ¶ 27. IDOC later set aside each of the three shift supervisors' terminations and instead assessed a 60-day disciplinary suspension against each. Id.

In July 2019, Plaintiff requested that IDOC return him to his position as shift supervisor. Id. at ¶ 20. He discussed that request with Defendant Eilers and explained that he was not happy as an assistant warden. Id. Defendant Eilers, although disappointed, indicated he understood and would accommodate Plaintiff's

request. Id.

In May 2020, Defendant Eilers contacted Plaintiff, informed Plaintiff that there were operational problems at the Western Illinois Correctional Facility ("Western") and asked Plaintiff if he would consider interviewing for the position of assistant warden of operations there. Id. at ¶ 28. Defendant Eilers informed Plaintiff that, if Plaintiff took the position, Defendant Eilers wanted Plaintiff to move as soon as possible. Id.

Plaintiff agreed to the interview for the position. Id. at ¶ 29. However, Plaintiff was concerned about accepting the Western assistant warden position because: (1) he was only three years away from retirement; (2) he enjoyed his job and job security as a shift supervisor; and (3) he would have to move from his Lexington, Illinois residence—which would involve sending his children to a different school system, selling his home, and purchasing a new home. Id.

Several days after Defendant Eilers contacted Plaintiff about interviewing for the Western assistant warden position, Defendants Eilers, Lindsay, and Jeffreys interviewed Plaintiff for the position.

Id. at ¶ 30.

Following the interview, Plaintiff was undecided as to whether he would accept the Western assistant warden position if offered. Id. at ¶ 31. Plaintiff's position as a shift supervisor provided him with some job security. Id. Plaintiff was aware from other people's accounts and his own observations while working at Pontiac that, in the past, "wardens and assistant wardens had been terminated from their jobs for arbitrary reasons without the ability he had as a shift supervisor to challenge that action." Id.

Several days after Plaintiff's interview, Defendant Eilers offered Plaintiff the Western assistant warden position and informed Plaintiff he would have to start the position in five days. Id. at ¶ 32. During discussions with Defendant Eilers, Plaintiff expressed his concern about job security as an assistant warden. Id. at ¶ 33. In response to Plaintiff's expressed concern, Defendant Eilers told Plaintiff that he "need not worry because [IDOC] no longer engaged in the arbitrary practices in its personnel decisions involving wardens and assistant wardens." Id. at ¶ 34.

On an unspecified date, Plaintiff accepted the Western

assistant warden position. Id. at ¶ 35. Plaintiff would not have accepted the position without Defendant Eilers' assurances of job security in that position. Id.

On March 5, 2021, Plaintiff was directed to a meeting in Springfield, Illinois with Defendant Eilers. Id. at ¶ 36. At the meeting, Defendant Eilers informed Plaintiff that Plaintiff was being terminated from his position with IDOC because of Plaintiff's involvement in the October 26, 2018, incident. Id. Plaintiff alleges that he "attempted to explain" his involvement in the October 26, 2018, incident to Defendant Eilers, but that Defendant Eilers "was unwilling to consider anything [Plaintiff] offered because [Defendant] Lindsay had already made the decision to terminate [Plaintiff's] employment." Id.

On May 31, 2021, Plaintiff sent Defendant Lindsay an email to explain his involvement in the October 26, 2018, incident in an attempt to have her reconsider her termination decision. Id. at ¶ 37. The following day, Defendant Lindsay informed Plaintiff that she was not at liberty to discuss the incident with him. Id.

On an unspecified date, Plaintiff learned that IDOC reinstated

the three shift supervisors referenced earlier. Id. at ¶ 38.

On March 4, 2022, Plaintiff, through his lawyer, sent a letter to Defendant Lindsay requesting that IDOC reinstate him as a shift supervisor and discipline him comparably to the three shift supervisors. Id. The letter described Plaintiff's involvement in the October 26, 2018, incident—that Plaintiff sent the drawing to Lieutenant Whitecotton in his capacity as the Pontiac acting internal affairs officer and that Plaintiff subsequently spoke with Lieutenant Whitecotton and Warden Kennedy to encourage IDOC to look into the incident. Id. Defendant Lindsay did not respond to Plaintiff's letter. Id.

Plaintiff asserts that IDOC terminating him and not reinstating him while retaining the three shift supervisors referenced earlier was "arbitrary" because of the supervisors' "conduct with respect to the incident….as compared to [Plaintiff's] involvement." Id. at ¶ 39.

Plaintiff further asserts that in terminating him, neither IDOC nor the individual Defendants provided Plaintiff with: 1) advance notice that disciplinary action might be taken against him and an opportunity to respond to that notice before disciplinary action was

taken or 2) an opportunity for a hearing after his termination to contest the disciplinary decision. Id. at ¶ 40.

### III.  LEGAL STANDARD

Defendants have moved to dismiss Plaintiff's Fourth Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. See d/e 33, p. 4. A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the complaint's sufficiency. Christensen v. Cnty. of Boone, 483 F.3d 454, 458 (7th Cir. 2007). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" that puts the defendant on notice of the allegations. Fed. R. Civ. P. 8(a)(2), see also Higgs v. Carver, 286 F.3d 437, 439 (7th Cir. 2002). The Court accepts all well-pled facts alleged and draws all possible inferences in the plaintiff's favor. Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008).

The complaint must put forth plausible grounds to demonstrate a claim for relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). A plausible claim is one from which the court can draw reasonable inferences that the defendant is liable for the

misconduct alleged. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).
Additionally, the complaint must raise a reasonable expectation
that discovery will reveal evidence of liability. <u>Twombly</u>, 550 U.S. at
556. A complaint merely reciting a cause of action or conclusory
legal statements without support is insufficient. <u>Iqbal</u>, 556 U.S. at
678.

The Due Process Clause of the Fourteenth Amendment forbids
a state from depriving any person of "life, liberty, or property,
without due process of law." U.S. Const. amend. XIV, § 1. "An
essential component of a procedural due process claim is a
protected property or liberty interest." <u>Minch v. City of Chi.</u>, 486
F.3d 294, 302 (7th Cir. 2007). "To demonstrate a procedural due
process violation of a property right, the plaintiff must establish
that there is '(1) a cognizable property interest; (2) a deprivation of
that property interest; and (3) a denial of due process.'" <u>Khan v.
Bland</u>, 630 F.3d 519, 527 (7th Cir. 2010) (quoting <u>Hudson v. City of
Chi.</u>, 374 F.3d 554, 559 (7th Cir. 2004)).

"In the employment context, a property interest can be created
in one of two ways, '1) by an independent source such as state law

securing certain benefits; or 2) by a clearly implied promise of continued employment.'" Phelan v. City of Chi., 347 F.3d 679, 681 (7th Cir. 2003) (citing Shlay v. Montgomery, 802 F.2d 918, 921 (7th Cir. 1986); see also Palka v. Shelton, 623 F.3d 447, 452 (7th Cir. 2010).

Notably, the absence of explicit contractual provisions "may not always foreclose the possibility that a [public employee] has a 'property' interest in [continued employment]." Perry v. Sindermann, 408 U.S. 593, 601 (1972). "Absent an express agreement, an at will employee may still prove a property interest in his or her employment under the second test if there is a 'clearly implied promise in their continued employment.'" Phelan, 347 F.3d at 682 (quoting Shlay, 802 F.2d at 921)). To demonstrate that there is a property interest, an at will employee plaintiff must show some "legitimate claim of entitlement" to the employment. Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972); see also Perry, 408 U.S. at 601 ("mutually explicit understandings that support [a] claim of entitlement" may give rise to a property interest in employment).

"In the absence of any controlling state statute, extrinsic

evidence of a policy or practice upon which a legitimate expectation of the continuation of a benefit can be based may provide a basis for the property right." <u>Patkus v. Sangamon-Cass Consortium</u>, 769 F.2d 1251, 1263 (7th Cir. 1985). "Traditionally, Illinois has treated announced and even written personnel policies as a gratuity that can leave the employer free to change or discontinue the policy at any time." <u>Id.</u> "If an employer's stated policies do not prove to have contractual status, an Illinois employee may still recover under the theory of promissory estoppel." <u>Id.</u> at 1264.

Under Illinois law, a claim for promissory estoppel requires the plaintiff to prove that "(1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to his detriment." <u>Quake Constr., Inc. v. American Airlines, Inc.</u>, 141 Ill.2d 281, 310 (1990).

## IV.   ANALYSIS

Plaintiff alleges in Counts I, II, and III of the Fourth Amended Complaint that Defendants Jeffreys, Lindsay, and Eilers, respectively, deprived Plaintiff of a property interest—his

employment—without due process of law under the Due Process

Clause of the Fourteenth Amendment. See d/e 32, pp. 9-12, ¶ 45.

Plaintiff argues that since the Personnel Code (20 ILCS 415/1

et seq.) and the collective bargaining agreement protected him from

termination absent good cause, he possessed a property interest in

his employment as an IDOC shift supervisor. See id. at p. 9, ¶ 42.

Plaintiff then argues that "by virtue of" Defendant Eilers'

assurances—that IDOC "no longer engaged in the arbitrary

practices in its personnel decisions involving wardens and assistant

wardens," id. at p. 7, ¶ 34—Plaintiff "continued to have a property

interest in his employment" after he became the Western assistant

warden. Id. at pp. 9, 10, 12, ¶ 43.

Defendants argue that "the fate of those three supervisors has

nothing to do with whether Plaintiff was fired arbitrarily." d/e 33, p.

5. Defendants argue that Plaintiff's Fourth Amended Complaint

acknowledges two reasons why he was fired: "because of his

involvement" in the October 26, 2018, incident and because "the

three supervisors were covered by a collective bargaining agreement

while Plaintiff was not." Id.

The Court notes that Plaintiff's Fourth Amended Complaint states that Defendant Eilers informed Plaintiff "that he was being terminated from his position with [IDOC] because of his involvement" in the October 26, 2018, incident. d/e 32, ¶ 36. Although Plaintiff's Fourth Amended Complaint does not explicitly allege that the collective bargaining agreement covered the three supervisors or Plaintiff's Western assistant warden position, Plaintiff alleges that "while holding the permanent position of shift supervisor[,] the terms of his employment were covered by a collective bargaining agreement." Id. at ¶ 8, see also id. at ¶¶ 21-22.

Plaintiff responds that his Fourth Amended Complaint "adequately allege[s] facts which support the proposition that he relied to his detriment upon a promise made to him by [Defendant] Eilers." d/e 34, p. 2. Plaintiff argues that "[t]he collective bargaining agreement covering the shift supervisor was not a 'stay out of jail card.' It provided that employees covered by it could be terminated if there was just cause." Id. at p. 6. Therefore, Plaintiff reasons, "[a]t most, the reinstatement of the shift supervisors reflects the view

that they engaged in misconduct, but it warranted a less severe form of discipline than termination" and that IDOC's "refusal to treat [Plaintiff] the same way was arbitrary." Id.

### A. Plaintiff Establishes a Property Interest In His Employment Under a Promissory Estoppel Theory as Required To Plead a Procedural Due Process Claim.

Considering the parties' arguments, the Court addresses each of the four prongs of a promissory estoppel claim that Plaintiff must prove under Illinois law: that "(1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to his detriment." Quake Constr., Inc. v. American Airlines, Inc., 141 Ill.2d 281, 310 (1990).

### 1. Plaintiff Alleges That Defendant Eilers Made Plaintiff an Unambiguous Promise.

Plaintiff alleges that Defendant Eilers had the authority to initiate termination actions for employees under his chain of command and told Plaintiff that IDOC "no longer engaged in the arbitrary practices in its personnel decisions involving wardens and assistant wardens." d/e 32, ¶¶ 5, 34. Thus, Plaintiff alleges that Defendant Eilers' statements constitute an unambiguous promise

to Plaintiff under the first prong of the promissory estoppel test. See

Quake, 141 Ill.2d at 310.

### 2. Plaintiff Alleges That He Relied on Defendant Eilers' Promise.

Plaintiff alleges that he would not have accepted the Western

assistant warden position without Defendant Eilers' statements

regarding job security in that position. See d/e 32, ¶ 35. Plaintiff

accepted the assistant warden position. Id. Thus, Plaintiff alleges he

relied on Defendant Eilers' statements regarding job security in that

position under the second prong of the promissory estoppel test.

See Quake, 141 Ill.2d at 310.

### 3. Plaintiff Alleges That His Reliance was Expected and Foreseeable by Defendant Eilers.

Plaintiff expressed his job security concern "during his

discussions" with Defendant Eilers. d/e 32 at ¶ 33. Defendant

Eilers made his statements about Plaintiff's concern about job

security "in response" to Plaintiff expressing his concern. Id. at

¶ 34. These discussions occurred during the five days between

when Defendant Eilers offered Plaintiff the Western assistant

warden position and when Defendant Eilers expected Plaintiff to

start the position. Id. at ¶¶ 32-35. Based on the timing and nature of those discussions, Plaintiff alleges that his reliance on Defendant Eilers' statements was expected and foreseeable by Defendants under the third prong of the promissory estoppel test. See Quake, 141 Ill.2d at 310.

### 4. Plaintiff Alleges That He Relied on Defendant Eilers' Promise to His Detriment.

Plaintiff alleges that in light of Defendant Eilers' unambiguous promise—that IDOC "no longer engaged in the arbitrary practices in its personnel decisions involving wardens and assistant wardens," d/e 32, ¶ 34—IDOC terminating Plaintiff "and not reinstating him as a shift supervisor while retaining the three shift supervisors referred to above was arbitrary because of the nature of their conduct with respect to the [October 26, 2018, incident] as compared to" Plaintiff's involvement. Id. at ¶ 39.

The Court again finds that the firing and reinstatement of the three shift supervisors has no bearing on whether Plaintiff's firing was arbitrary. Plaintiff does not allege that the collective bargaining agreement covered his acts as Pontiac shift supervisor both while and after he held that position in order to establish his property

interest in his employment as Western assistant warden. Therefore, that the three supervisors' worse behavior failed to satisfy their collective bargaining agreement's "just cause" standard for termination does not inform the inquiry of whether Plaintiff's behavior satisfied the "arbitrary" standard in Defendant Eilers' alleged unambiguous promise.

However, as Plaintiff asserts in his reply, his more detailed Fourth Amended Complaint demonstrates that Plaintiff "engaged in no misconduct" in the October 26, 2018, incident. d/e 34, p. 4. Plaintiff alleges that he shared the form and drawing with his supervisors while explaining to them why he did so, such that his involvement in the prank demonstrably differed from participation. See d/e 32, ¶¶ 13-16, 18. Accepting Plaintiff's pled facts as true at the motion to dismiss stage, Bible v. United Student Aid Funds, Inc., 799 F.3d 633, 639 (7th Cir. 2015), Plaintiff alleges facts indicating that his firing for "engag[ing] in no misconduct," and arguably whistleblowing, was arbitrary. d/e 34, p. 4.

In sum, Plaintiff alleges that he relied to his detriment on a promise that IDOC would not fire him arbitrarily—as IDOC then

fired him arbitrarily—under the fourth prong of the promissory estoppel test. See Quake, 141 Ill.2d at 310. Therefore, Plaintiff's claim to a property interest in his employment under a promissory estoppel theory alleges all four elements required under Illinois law.

### B. Plaintiff Establishes a Deprivation of His Property Interest and a Denial of Due Process as Required To Plead a Procedural Due Process Claim.

Plaintiff asserts an established property interest in his employment—the first requirement of a procedural due process claim. See Khan v. Bland, 630 F.3d 519, 527 (7th Cir. 2010).

Next, Plaintiff alleges in his Fourth Amended Complaint "a deprivation of that property interest," id., in IDOC's "actions in terminating" him. d/e 32, ¶ 39, see also id. at ¶¶ 36-37. Finally, Plaintiff's Fourth Amended Complaint alleges "a denial of due process," Khan, 630 F.3d at 527, in that neither IDOC nor the named Defendants gave him "any advance notice… [or] opportunity to respond to that notice before any disciplinary action was taken" or "any opportunity for a hearing after his termination to contest that disciplinary decision." d/e 32, ¶ 40.

Therefore, Plaintiff establishes all three elements necessary

"[t]o demonstrate a procedural due process violation of a property right[,]" as are all three Counts of Plaintiff's Fourth Amended Complaint. <u>Khan</u>, 630 F.3d at 527.

**V. CONCLUSION**

Because Plaintiff's Fourth Amended Complaint pleads that his procedural due process rights were violated, Defendants' Motion to Dismiss Plaintiff's Fourth Amended Complaint (d/e 33) is DENIED.

**ENTERED: October 24, 2025.**

**FOR THE COURT:**

/s/ Sue E. Myerscough
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**